## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:18-cv-01950

American Cobalt, LLC

Plaintiff,

v.

Lewis Rice, LLC; Pamela E. Barker; Robert J. Golterman; John J. Diehl, Jr.; Stacy Hastie; Missouri Cobalt, LLC; Environmental Risk Transfer, LLC; and Environmental Operations, Inc.

Defendants.

## COMPLAINT BASED UPON SELF-DEALING AND BREACHES OF FIDUCIARY DUTY

### I.  COMPLAINT AND JURY DEMAND

Plaintiff American Cobalt, LLC brings this Complaint and Jury Demand through its undersigned attorney.

### II.  SUMMARY

Through the efforts of American Cobalt, Missouri Cobalt now owns the Madison Mine Property in Fredericktown, Missouri. American Cobalt is a 20% owner of Missouri Cobalt; and an affiliate of Environmental Risk Transfer, LLC ("ERT") is

*1*

an 80% owner. ERT is owned and controlled by Stacy Hastie and Randy Waterfield. The General Counsel of ERT and Missouri Cobalt is John Diehl.

Mr. Hastie and Mr. Diehl are engaged in a scheme to dilute and squeeze out American Cobalt by having Missouri Cobalt issue a Cash Call for $REDACTED that comes due in less than fifteen days.  The Cash Call is unsupported and economically unreasonable. For example, the majority of the projected expenses allegedly justifying the expenditure of $REDACTED are based on estimated and inflated expenses that in part benefit EOI/ERT to the detriment of American Cobalt, and that cannot be incurred without first obtaining lawful permits. To the best of American Cobalt's knowledge, the required environmental and mining permits have not been obtained. The Cash Call also seek funds that were required and promised at closing, from which an affiliate of ERT (EOI) was supposed to draw down as its work progressed.

Mr. Hastie and Mr. Diehl are preventing American Cobalt from evaluating and participating in the Cash Call by: refusing to provide material information about newly discovered cobalt reserves and the current fair market value of Missouri Cobalt; and not allowing third parties, who are interested in helping American Cobalt meet the Cash Call and enhance the value of the Project in the community, to visit the Madison Mine Property, while allowing potential investors in Missouri Cobalt to visit the Property.

*2*

## III. PARTIES

1. Plaintiff American Cobalt, LLC ("AC") is a limited liability company formed and maintained under the laws of the State of Delaware. It maintains its principal place of business in Denver, Colorado; and its two managers and members reside in the Denver metro area.

2. Defendant Lewis Rice, LLC ("LR") is a limited liability company, which is maintained under the laws of the State of Missouri, with its principal place of business in St. Louis, Missouri.

3. Pamela E. Barker is a member of LR, who resides in the metro area of St. Louis, Missouri.

4. Robert J. Golterman is a member of LR and a Director of Fred Webber, Inc., a contractor on the MM project. Mr. Golterman resides in the metro area of St. Louis, Missouri.

5. John J. Diehl, Jr. is Missouri Cobalt's General Counsel and Vice-President, and General Counsel and Vice President of Real Estate of both ERT and EOI. He resides in the metro area of St. Louis, Missouri.

6.  Stacy Hastie is Co-Chairman of the Board of Managers of Missouri Cobalt, LLC, and Chief Executive Officer of ERT and Chairman/CEO of EOI. He resides in the metro area of St. Louis, Missouri.

7.  Missouri Cobalt, LLC ("MC") is a limited liability company formed and maintained under the laws of the State of Delaware, which maintains its principal place of business in St. Louis, Missouri, at 1530 S. Second Street, St. Louis, MO 63104.

8.  Environmental Risk Transfer, LLC ("ERT") is a limited liability company formed and maintained under the laws of the State of Missouri, which maintains its principal place of business in St. Louis, Missouri, at 1530 S. Second Street, St. Louis, MO 63104.

9.  Environmental Operations, Inc. ("EOI") is a corporation formed and maintained under the laws of the state of Missouri, which maintains its principal place of business in St. Louis Missouri at 1530 S. Second Street, Suite 200, St. Louis, MO 63104.

## IV.  JURISDICTION, VENUE AND SERVICE OF PROCESS

10.  Plaintiff seeks damages under claims of fraudulent inducement, breach of fiduciary duty, unjust enrichment, and for injunctive relief, and declaratory relief under Title 28 to the United States Code, §§2201 et seq.

*4*

11. Because the parties are of diverse citizenship and the amount in controversy exceeds $75,000 (exclusive of interest, costs), this Court has jurisdiction under 28 U.S.C. §1332.

12. Venue is proper in this Court under 28 U.S.C. §1391 because the Plaintiff's principal place of business is located in Denver, Colorado, its managers and members reside in Colorado, the legal representation relationship between the Plaintiff and LR was established in a phone call and letter from St. Louis, Missouri to Denver, Colorado, and Defendants Diehl and Hastie fraudulently induced Plaintiff  in person in Denver and in phone calls and emails from St. Louis to Denver, Colorado.

## V.  OPPRESSION AND SQUEEZE-OUT OF AC

### A. Defendants Hastie and Diehl as Fiduciaries

13. The directors, managers and officers of MC have fiduciary duties of loyalty, good faith, and care to AC, a 20% owner of MC.

14. Defendant Stacy Hastie is a Manager of MC, and CEO and principal Owner of ERT, and CEO and principal Owner of EOI.

15. Defendant John Diehl is an Officer and General Counsel of MC, and an Officer and Owner of ERT and EOI.

16. Defendants Hastie and Diehl have fiduciary duties to AC.

17. Defendants Hastie and Diehl have knowingly and recklessly violated their fiduciary duties, including their duties of loyalty, good faith, and not engaging in self-dealing or oppression of AC as a minority owner of MC by the following acts and omissions:

   a) Fraudulently inducing AC to agree to the transaction with ERT and the formation of MC through threats, coercion and misrepresentations;

   b) Fraudulently inducing AC to enter into an agreement with ERT by misrepresenting the transaction as equity based, when ERT's 80% participation was and is loan based;

   c) Fraudulently inducing AC to enter into an agreement with affiliate EOI by misrepresenting EOI's capabilities, causing AC to make detrimental decisions based on EOI's and Defendants Hastie's and Diehl's misrepresentations.

   d) Issuing a Cash Call for $REDACTED that is unsupported and reckless, and is designed to dilute AC to the benefit of ERT and Defendants Hastie and Diehl;

e) By self-dealing through artificially inflating the remediation payments due from MC to ERT and EOI, companies owned and controlled by Defendants Hastie and Diehl; and

f) Failing to disclose or provide material information, including loans in excess of $REDACTED.

18. Because Defendants Hastie and Diehl are knowingly or recklessly breaching their duties of loyalty, good faith, the burden of proving the inherent or entire fairness of their actions, including all aspects of the recent Cash Call, is placed upon them as a matter of law.

**B. Lewis Rice Defendants as Fiduciaries**

19. On September 29, 2018, LR agreed to provide legal services and advice to AC, which created a special fiduciary relationship of trust.

**C. Operating Agreement**

20. The Operating Agreement was received by AC after the close of business on a Friday. AC was told it had to sign the Operating Agreement by the following Tuesday, giving AC approximately 24 hours to find and retain competent counsel, and get an opinion from counsel.

21. The Operating Agreement is voidable because it was signed under duress and without advice of competent counsel.

22. The Operating Agreement purports to waive fiduciary claims:

> 12.8    No Fiduciary Duties. Managers will serve as representatives of the Member that designated them and will owe no fiduciary duties to the Company or the other Members. The Company and each Member hereby waives any claim or cause of action against any other Member and any Manager designated by or at the direction of such Member for any breach of fiduciary duty to the Company by such Member or any Manager designated by that Member as a result of any actual or alleged breach of fiduciary duties, the Members hereby expressly acknowledging and agreeing that the sole obligations of the parties are those contained in the express terms of this Agreement (and the other written agreements among the parties), and no implied duties are intended to be created or enforceable hereunder.

23. There has been no waiver even under the Operating Agreement of fiduciary claims against John Diehl as General Counsel and an Officer of MC, MC, or Lewis Rice and its partners. The purported waiver of fiduciary claims against Defendant Stacy Hastie as a Manager of MC are voidable; and the fraudulent inducement claim against Defendants Hastie and Diehl cannot be waived.

**D. Diehl's Coercive Threats and Lewis Rice's Complicity**

24. Defendant Diehl, with the complicity of LR, fraudulently induced AC to pay monies not owed, by falsely representing that LR would block the closing

unless it was paid a fee of $15,000, and that the Anschutz closing would not proceed and AC would not receive the $REDACTED it was owed under the Purchase and Lease Agreement.

25. On September 29, 2018, Don Gunn, an AC manager, and John Spisak, an AC employee, had a phone conversation with Lewis Rice and Defendant Golterman about LR providing AC with legal services and advice for AC's acquisition of a cobalt mine in Fredericktown, Missouri, known as the Madison Mine. AC informed Lewis Rice that time was of the essence and it was retaining LR for the preparation of documents needed immediately for acquisition of the Madison Mine.

26. On October 3, 2017, Defendant LR and Defendant Golterman sent an Engagement Letter to AC at its Denver office. The Engagement Letter stated that AC would be billed monthly.

27. LR requested, but did not receive a $5000 retainer.

28. Although Mr. Golterman mentioned that in the past LR had done some work for ERT/EOI (entities involved in environmental remediations and employers of John Diehl), the Engagement Letter did not disclose ERT/EOI as active clients, and the letter did not disclose their involvement in the related matter of acquisition of the Madison Mine.

29. Mr. Golterman did not disclose at any time that he was a Director of Fred Webber, Inc., a contractor that would profit from working on the Madison Mine Project through contracts with EOI.

30. Because it did not receive the acquisition documents it had requested for immediate use, AC informed LR on October 12, 2018 that its services were no longer required.

31. Approximately a week after proposing the Engagement Letter, LR sent a letter to AC dated October 11, 2017 ("Conflict Letter"), stating, for the first time, it had a conflict concerning the Madison Mine that required a waiver from AC.

32. In the Conflict Letter, LR admitted:

   a) It was retained by AC to provide AC with legal advice concerning the purchase of the Madison Mine, which LR  described as the "Matter";

   b) LR's "representation of AC in the Matter may result in AC and Firm being adverse to EOI"; and

   c) LR's "duty as attorneys in all matters pertaining to the Matter will be owed exclusively to AC".

33. The Conflict Letter requested "waiver of any conflict in our representation of AC in the Matter and your respective entity's consent to our representation of EOI in unrelated matters".

34. LR, however without securing any waiver from AC, provided EOI and ERT with representation in both unrelated matters and in the related Matter.

35. On the eve of the March 1, 2018 closing on the AC- ERT-MC transaction, John Diehl contacted Don Gunn by phone and informed him and AC that the closing would not go through unless within the next 24 hours AC authorized payment of a $15,000 fee for legal services.

36. On March 1, 2018, Mr. Diehl also sent AC an email stating: "Lewis Rice says you guys owe them 15K +/-  I assume ok to pay out of your 2m?  Need to settle up to release closing…  By the way we have just forked out about [$REDACTED]  of legal bills.   The bosses don't want to pay for yours…."

37. Because of the threat of the deal falling through, AC was under duress to authorize the payment of $15,000 in fees.

38. The threat to prevent the closing subjugated the mind and will of Mr. Gunn and forced him to cause AC to succumb to the threat by agreeing to pay $15,000 in fees for which AC had never been billed.

39. At the request of AC's counsel, on April 27, 2018 LR provided an invoice , which is dated March 16, 2018, or seventeen days after Mr. Diehl told AC that LR would prevent the closing if it was not paid the $15,000 it was owed by AC.

40. Since discharging LR in October of 2017, AC had never previously received an invoice from Lewis Rice, or any indication from LR that AC would be billed for legal services.

41. LR has recently admitted the value of the services it had provided in October of 2017 was actually about $9000, not $15,000.

42. Lewis Rice has also recently provided the transcript of a long telephone conversation between Defendant Barker and John Diehl on October 5, 2018. Throughout the conversation, Defendant Barker and John Diehl acknowledge the conflicting interests of AC and ERT/EOI, other LR clients involved in the acquisition and remediation of the Madison Mine. Nonetheless, they discuss inflating the estimated cost of remediation to be performed by ERT, which would limit ERT's environmental liability while increasing AC's liability by pushing costs into operations:

43. LR Defendants were complicit with Mr. Diehl, by action and inaction, in putting him and persons and entities affiliated with him in a position advantageous to them and detrimental to AC.

44. Upon information and belief, Mr. Golterman was aware of Ms. Barker's communications with Mr. Diehl; and was responsible for her actions in his supervisory capacity.

45. AC has been damaged in an amount to be determined at trial.

**E. Unsupported Cash Call**

46. Missouri Cobalt, through Defendants Diehl and Hastie, and possibly others, have orchestrated a Cash Call for $REDACTED that is economically unreasonable and unjustified, and that is designed for the purpose of diluting ACs ownership in MC and forcing AC to abandon the Madison Mine project that AC brought to MC.

47. With the complicity of the LR Defendants, the Cash Call seeks remedial funds that have been inflated and that were supposed to be escrowed and drawn upon by ERT as its work progressed.

48. To support the Cash Call, Defendants Diehl and Hastie prepared and submitted a Cap-Ex Forecast.

49. Lines 16-17 and 20-22 of the Cap-Ex Forecast are as follows:

16. Environmental Operations, Inc. ………...$REDACTED

17. Golder & Associates…………………….$REDACTED

20. TB Metals, Inc…………………………...$REDACTED

21. Concentrate Operations………………….$REDACTED

22. Excavate/Landfill Tailings………………$REDACTED

50. EOI was to put up these expenses, which total in excess of $REDACTED, as part of the original investment; and they were to be escrowed and layered with the safety factor of insurance.

51. AC has received no evidence that the funds were escrowed or that insurance was obtained.

52. The Cash Call, therefore, is an attempt to dilute AC by seeking additional funds for monies that were required at closing, from which EOI was supposed to draw down from as its work progressed.

53. The work identified in lines 19-26 and 35-42 of the Cap-Ex Forecast, which project a need for $REDACTED in additional funding, cannot be lawfully

*14*

performed without environmental, mining and mineral permits, which, to the best of AC's knowledge, have not been obtained.

54. Proceeding with that work without the required permits could result in substantial fines and serious sanctions.

55. AC has requested from MC, but has not received, a feasibility study or an economic analysis study of the current value of the Property/Project to justify the expenditure of $REDACTED. Without a reasonable expectation of return of value, it would be unreasonable to put that quantity of money into the Project.

56. Without legal authority, Defendant Diehl is attempting to prevent AC from AC inviting to the Madison Mine entities interested in providing AC with funds responsive to the Cash Call.

57. Without legal authority, and six months after closing and innumerable emails and documents where AC used its name, Defendant Diehl is now claiming, for the first time, that the members of AC cannot use the name of AC because AC transferred the same right to use the name of AC to MC.

58. The Cash Call is fraudulent and should be withdrawn immediately.

**F. Assurances of an Equity Based Transaction**

59. Knowing that American Cobalt had a bona fide offer from an Australian mining company, which was based on a true equity injection (not loan based) into the Madison Mine Project, Defendants Diehl and Hastie enticed American Cobalt to become an owner of Missouri Cobalt by representing that ERT would, like American Cobalt, make an equity infusion.

60. At a meeting in Las Vegas on November 30, 2017, Defendants Diehl and Hastie agreed that the transaction between AC and ERT would have an equity substantially in the form of the Australian offer, a copy of which was provided to Defendants Diehl and Hastie.

61. The voidable Operating Agreement refers to "Additional Equity Issuance" in section 6.10, which confirms there was an "Initial Equity Issuance."

62. The closing on the acquisition of 80%  by MC occurred on February 7, 2018.

63. The closing on the Anschutz transaction occurred on or about March 2, 2018.

64. Prior to either closing there was no discussion about ERT acquiring a loan or loans to become am 80% owner of Missouri Cobalt.

65. Defendants Diehl and Hastie fraudulently represented to AC on numerous occasions that the transaction would be equity based.

66. Since no equity was infused by ERT, the Cash Call would have the effect of compelling AC to accept that it has liability for returning, with interest, at least 20% of the $REDACTED paid and 20% of the second $REDACTED owed to AC upon successful completion of the drilling program.

67. By putting up $REDACTED as a loan, instead of equity, twenty percent of that loan obligation has been wrongfully imposed on American Cobalt as a 20% owner of MC.

## G. Self-Dealing and Unauthorized Action

68. Defendants Diehl and Hastie have engaged in self-dealing and without authority  by: a) Inflating the remediation expenses of EOI, a company they own and control; b) Not contributing equity, but rather by financing ERT, a company they own and control, through undisclosed and unapproved loans in excess of $REDACTED;  c) by making press releases and statements to the press not approved by the Board and to the detriment of AC's ownership; and d) by creating an unsupported, unjustified and economically unreasonable Cash Call for the purpose of diluting AC and then bringing in other investors to increase the value of MC.

**H. Failure to Disclose or Provide Material Information**

69. Because Defendants Hastie and Diehl dominate and control the business and corporate affairs of MC, and are in possession of material information concerning MC's assets, business, and future prospects, which they refuse to share with AC, there exists an imbalance and disparity of knowledge and economic power between AC and Defendants Hastie and Diehl, which makes it inherently unfair for them to pursue and recommend the proposed Cash Call, from which they would reap disproportionate benefits to the exclusion of maximizing the value of AC's ownership.

70. On behalf of MC and its Board, Defendant Diehl has refused to provide the material information repeatedly requested by AC and necessary for any reasonable assessment of the Cash Call, for example:

   ▪ Current update of the resource/reserve evaluation report. Without new valuation of the marcasite layer, and confirmatory data, a mining plan cannot be developed and the work program outlined in the Cash X Forecast provided by Defendant Diehl cannot be justified.

   ▪ Current FMV. (No prudent Board member can approve an expenditure of $REDACTED without a feasibility study or economic analysis of the current value of the Project.)

- Detailed budgets.

- Financials.

- Reserve size determination/new ore discoveries.

- Mine development plan.

- Loan documents.

## VI.  DAMAGES

71. The damages caused by the Defendants are no less than the loss of several million dollars in project value because:

  a) There is at least $REDACTED of recoverable cobalt, nickel and copper in the Madison Mine;

  b) Defendants' client EOI/ERT/ Diehl received 80% ownership of the Madison Mine for an amount of a $REDACTED investment, $REDACTED of which consisted of deliberately inflated remediation charges determined in collusion with the LR Defendants, the total of which amounted to $REDACTED per percent of the Project.

  c) Defendants and EOI/ERT/Diehl inflated the price of the remediation, keeping any reduction in cost from flowing back to the seller or to the benefit of AC.

*19*

d) The cost of the remediation was inflated by at least $REDACTED.

e) On the basis of a valuation of $REDACTED per percent of ownership, the inflated remediation cost caused AC to give up 5.33% more of the project than it would otherwise have – causing AC to lose in excess of $REDACTED of value.

**FIRST CLAIM FOR RELIEF AGAINST *DEFENDANTS LEWIS RICE, BARKER AND GOLTERMAN*: BREACH OF FIDUCIARY DUTY**

1. All preceding and succeeding allegations in this Complaint are incorporated into this Claim for Relief.

2. The LR Defendants owed the Plaintiff the obligations of a fiduciary.

3. The LR Defendants breached their fiduciary obligations to the Plaintiff by:

a) Rather than providing the documentation that the Plaintiff had urgently requested for acquisition of the Madison Mine, the LR Defendants, through action and inaction, cooperated with John Diehl in advancing and protecting the interests of entities with whom he was affiliated, ERT and EOI, by positioning them to profit from acquisition of the Madison Mine through inflating estimates of remediation costs or increasing the operational liability of the Plaintiff;

b) The LR Defendants, through action and inaction, facilitating John Diehl's effort to coerce the Plaintiff into signing an extremely one-sided Operation Agreement unfavorable to the minority interest of the Plaintiff and favorable to the majority interest he represented: and by allowing John Diehl on the eve of closing to falsely represent that LR was requiring the Plaintiff to pay $15,000 for services provided the Plaintiff by LR in October of 2017, even though LR never previously billed the Plaintiff for any services, even though LR had no intention of billing the Plaintiff until John Diehl instructed them to do so, and even though LR has recently admitted the value of its services was only about $9000; and

c) The LR Defendants, through action and inaction, participating in or ratifying the threat made through Mr. Diehl.

4. The amount of damages caused by the Defendants' breaches of fiduciary duty will be determined by the trier of fact at trial.

## SECOND CLAIM FOR RELIEF AGAINST *DEFENDANTS DIEHL AND HASTIE*: FRAUDULENT INDUCEMENT

1. All preceding and succeeding allegations in this Complaint are incorporated into this Claim for Relief.

2.  Defendants Hastie and Diehl induced AC into selling 80% of their interest in the Madison Mine Property and entering into an agreement with ERT and MC by falsely representing that the agreement would be equity based on both sides, and not loan based.

3.  Defendants Hastie and Diehl concealed the material fact that ERT's participation would be loan based.

4.  Defendants Hastie and Diehl knew the representation that the transaction would be equity based was false.

5.  Defendants Hastie and Diehl made the misrepresentation with the intent that AC would rely on it.

6.  AC entered into the agreement in reliance on the representation that the transaction would be equity based on both sides.

7.  The reliance was justified.

8.  AC's reliance has caused it substantial damages in an amount to be determined at trial.

**THIRD CLAIM FOR RELIEF AGAINST *DEFENDANTS DIEHL AND HASTIE*: BREACH OF FIDUCIARY DUTY AND SELF-DEALING**

1. All preceding and succeeding allegations in this Complaint are incorporated into this Claim for Relief.

2. AC justifiably placed trust and confidence in Defendants Diehl and Hastie.

3. Defendants Diehl and Hastie owed AC the obligations of a fiduciary.

4. Defendants Diehl and Hastie have breached their fiduciary obligations to the Plaintiff by:

    a) Falsely representing that ERT's participation in the MC agreement would be equity based;

    b) Making a Cash Call that is unsupported, and economically unreasonable, for the purpose of diluting AC, and profiting from increased value resulting from the involvement of new investors;

    c) Making a Cash Call that seeks funds that were required at closing, from which EOI was supposed to draw down as its work progressed.

    d) Causing the remediation costs to be inflated so that ERT and EOI, companies owned and controlled by them, would profit to the detriment of AC;

e) Not obtaining required permits;

f) Not obtaining the environmental  insurance coverage when it had been promised;

g) Refusing to disclose material information required for assessment of the Cash Call;

h) Preventing AC from negotiating with outside investors interested in acquiring an interest in AC by not allowing the outside investors to visit the Madison Mine Property.

i) Scheming with the firm that represented AC, Lewis Rice, to structure agreements that favored ERT and EOI, also clients of Lewis Rice, and disfavored and harmed AC.

5. The breaches of fiduciary duties have caused AC substantial damages in an amount to be determined at trial.

**FOURTH CLAIM FOR RELIEF AGAINST *DEFENDANTS HASTIE, DIEHL, EOI AND ERT*: UNJUST ENRICHMENT**

1. All preceding and succeeding allegations in this Complaint are incorporated into this Claim for Relief.

2.  Defendants Hastie, Diehl, EOI and ERT received, accepted and utilized AC's knowledge, expertise and services.

3.  It would be unjust for them to use and retain the benefits without paying AC for them.

4.  As a result of their failure to pay AC the reasonable value of the benefits they received and accepted, Defendants Hastie, Diehl, EOI and ERT have been unjustly enriched and AC has been damaged in an amount to be determined at trial.

## FIFTH CLAIM FOR RELIEF AGAINST MISSOURI COBALT: PRELIMINARY INJUNCTION TO MAINTAIN STATUS QUO PRE CASH CALL

1.  All preceding and succeeding allegations in this Complaint are incorporated into this Claim for Relief.

2.  If Missouri Cobalt is allowed to proceed with the  Cash Call, AC will be diluted and lose its ownership and investment, causing real, immediate and irreparable harm to AC that can only be prevented by injunctive relief.

3.  There is no plain, speedy, and adequate remedy at law.

4.  The granting of a preliminary injunction will not disserve the public interest.

5.  The balance of equities favors the requested injunction.

6.  The injunction would preserve the status quo pending a trial on the merits.

7.  There is a reasonable probability of success on the merits.

8.  AC requests that the Court enter a preliminary injunction requiring Missouri Cobalt to withdraw or suspend the Cash Call for a period of time to be determined by the Court.

**SIXTH CLAIM FOR RELIEF AGAINST *MISSOURI COBALT*: DECLARATORY JUDGMENT THAT OPERATING AGREEMENT IS VOID OR VOIDABLE**

1.  All preceding and succeeding allegations in this Complaint are incorporated into this Claim for Relief.

2.  There is a justiciable controversy between AC and MC concerning the enforceability of the Missouri Cobalt Operating Agreement.

3.  As alleged in the Complaint, AC executed the Operating Agreement under duress and without an opportunity to seek advice of competent legal counsel.

4.  AC therefore requests that the Court declare the Operating Agreement void or voidable.

**PRAYER FOR RELIEF**

WHEREFORE, In sum, the Plaintiff, American Cobalt, LLC, requests the following relief:

1. That the Court award against Defendants Lewis Rice, Barker And Golterman an amount to be determined at trial for breaches of fiduciary duties;

2. That the Court award against Defendants Hastie and Diehl an amount to be determined at trial for fraudulent inducement;

3. That the Court award against Defendants Hastie and Diehl an amount to be determined at trial for breaches of fiduciary duties and for self-dealing;

4. That the Court award against Defendants Hastie, Diehl, EOI and ERT an amount to be determined at trial for unjust enrichment;

5. That the Court enter a preliminary injunction requiring Missouri Cobalt to withdraw or suspend the Cash Call for a period of time to be determined by the Court;

6. That the Court declare the Operating Agreement void or voidable; and

7. All such other relief to which the Plaintiff may be justly entitled.

**JURY DEMAND**

A jury is demanded as the trier of fact for all claims that are so eligible.

Respectfully submitted this 31st day of July, 2018, electronically via CM/ECF.

*/s/ Richard A. Oertli*

Richard A. Oertli, #24936
24800 Squaw Pass
Evergreen CO 80439
720-799-5217
dickoertli@gmail.com

Attorney for Plaintiff American Cobalt, LLC